UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

——————————————————

TINDALL CORPORATION,

                    Plaintiff,                              1:22-CV-00745-JLS-MJR

                                                           REPORT AND RECOMMENDATION

          -v-

BERKLEY ASSURANCE COMPANY,

                    Defendant.

——————————————————

## INTRODUCTION

This case has been referred to the undersigned pursuant to Section 636(b)(1) of Title 28 of the United States Code, by the Honorable John L. Sinatra, Jr., to hear and report on dispositive motions for consideration by the District Court. (Dkt. No. 12). Before the Court are opposing motions for summary judgment brought by plaintiff Tindall Corporation (Dkt. No. 31) and defendant Berkley Assurance Company (Dkt. No. 32) pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, it is recommended that defendant Berkley Assurance Company's motion be granted and plaintiff Tindall Corporation's motion be denied.

## PROCEDURAL HISTORY

On September 30, 2022, plaintiff Tindall Corporation commenced this insurance contract action.[1] (Dkt. No. 1). Plaintiff alleges that defendant Berkley Assurance Company failed to honor the terms of a Contractor's Professional Policy issued by defendant after

---

[1] The action was brought in District Court based on diversity jurisdiction pursuant to 28 U.S.C. § 1332. (Dkt. No. 1, ¶¶ 2-4).

plaintiff asserted a claim for coverage arising from a construction project undertaken by plaintiff at the Samuel S. Baxter Water Treatment Plant in Philadelphia, Pennsylvania. (*Id.*). Plaintiff asserts one cause of action for breach of contract and seeks declaratory judgment against defendant. (*Id.*).

Defendant answered the complaint on December 5, 2022. (Dkt. No. 10). A case management order was entered, which was later amended twice, and the parties proceeded with discovery. (Dkt. Nos. 16; 22; 28). On March 26, 2024, plaintiff filed a motion for summary judgment. (Dkt. No. 31). On the same date, defendant also filed a motion for summary judgment. (Dkt. No. 32). The parties each filed responses in opposition to the motions (Dkt. Nos. 33; 34), as well as reply briefs (Dkt. No. 35; 36).

The Court heard oral argument on the summary judgment motions on June 18, 2024. At that time, the Court gave the parties leave to submit supplemental briefing on several issues. The parties filed supplemental memoranda (Dkt. Nos. 41; 42), as well as supplemental replies (Dkt. Nos. 43; 44). At that time, the Court considered the matter submitted for report and recommendation.

## FACTS[2]

This dispute arises from an insurance contract between plaintiff Tindall Corporation and defendant Berkley Assurance Company. Tindall is a South Carolina corporation engaged in the design, manufacture, and construction of precast concrete structures. (Dkt. No. 32-6, ¶ 1). Berkley is an insurance company organized and having a principal

---

[2] The facts described herein are taken from the pleadings, motion papers, statements of undisputed facts, and exhibits filed in this lawsuit. When citing a proposed fact within plaintiff's statement of material facts (Dkt. No. 31-1) or defendant's statement of material facts (Dkt. No. 32-6), the Court has confirmed that the opposing party's responding statement (Dkt. Nos. 33-1; 34-3) either admits the fact or fails to specifically controvert it with evidence. *See* W.D.N.Y. L.R. Civ. P. 56(a).

place of business in Iowa. (Dkt. No. 1, ¶ 3). Tindall seeks coverage for losses caused by engineering errors it made on concrete products designed and manufactured for the Baxter Water Treatment Plant.

Berley insured Tindall pursuant to a Contractor's Professional Policy, bearing policy number PCAB-5009786-1019, for the policy period of October 1, 2019 to October 1, 2020 ("the Policy"). (Dkt. No. 32-6, ¶ 2; *see* Dkt. No. 1-1). The Policy provides, among other coverages, an Insuring Agreement ("Insuring Agreement B") which gives Professional Liability coverage to Tindall for professional claims made against it arising out of negligent acts, errors, or omissions in the rendering of professional services. (Dkt. No. 31-1, ¶ 2). The Policy contains numerous separate insuring agreements, including Protective Indemnity, Professional Liability, Contractor Pollution Liability, Cyber Liability, and Media and Personal Injury Liability. (Dkt. No. 32-6, ¶ 4).

The Policy is governed by New York law pursuant to a choice of law provision in the contract. (*Id.*, ¶ 3). The aggregate limits of liability under the Policy are $5,000,000. (*Id.*, ¶ 4). The Policy further provides $1,000,000 in coverage for Mitigation, which covers costs that Tindall may incur to avoid a claim under any of the five insuring agreements. (*Id.*, ¶ 5). Professional Liability Claims and Mitigation Claims under the Policy are subject to a $150,000 self-insured retention. (*Id.*, ¶ 6).

### Terms of the Insurance Policy

At the outset, the Policy states that it is a "Claims Made and Reported Policy," meaning it:

> APPLIES ONLY TO CLAIMS WHICH ARE FIRST MADE BY OR AGAINST YOU DURING THE POLICY PERIOD OR THE OPTIONAL EXTENDED REPORTING PERIOD, IF APPLICABLE, AND FIRST

3

> REPORTED IN WRITING TO US IN THOSE PERIODS OR THE
> AUTOMATIC EXTENDED REPORTING PERIOD.

(Dkt. No. 32-6, ¶ 7).

Section I.B. of the Policy is the Insuring Agreement for Professional Liability

coverage and reads as follows:

> We will defend you against any Professional Claim (as provided in
> Section III.A. of this Policy) and pay on your behalf all Damages and
> Claim Expense for that Professional Claim in excess of any applicable
> Self-Insured Retention, provided that:
>
> 1. the Professional Claim arises out of an actual or alleged negligent
> act, error or omission in the rendering of or failure to render
> Professional Services by you, or by a Responsible Entity for whom
> you are legally responsible, on or after the Retroactive Date and
> before the end of the Policy Period; and
>
> 2. the Professional Claim is first made against you during the Policy
> Period or Optional Extended Reporting Period, if applicable, and
> reported in writing by you to us during one of those periods or the
> Automatic Extended Reporting Period; and
>
> 3. prior to the effective date of the first policy insuring this type of
> Professional Claim issued to you, and continuously renewed by us,
> the Principal Personnel had no knowledge of circumstances which
> could give rise to a Professional Claim.

(*Id.*, ¶ 8).

Section I.F. of the Policy is the Insuring Agreement for Mitigation coverage and

reads as follows (Ex. 1 at BCP002818-19):

> We agree to pay you or on your behalf for Mitigation Cost in excess of
> any applicable Self-Insured Retention to mitigate or avoid a
> Professional Claim, Pollution Claim, Cyber Claim or Media and
> Personal Injury Claim that would be covered under this Policy,
> provided that:
>
> 1. the services or other activities you seek to mitigate or rectify were
> rendered or performed on or after the Retroactive Date and before the
> end of the Policy Period; and

2. the circumstances that would reasonably be expected to lead to such Claim are first reported in writing by you to us during the Policy Period; and

3. prior to the effective date of the first policy insuring such type of potential Claim issued to you, and continuously renewed by us, the Principal Personnel had no knowledge of circumstances that could give rise to a Claim; and

4. before incurring any Mitigation Cost, you demonstrate to us the reasonableness and necessity of the proposed cost in light of the projected benefit in terms of mitigating or avoiding a covered Claim, and we provide our express written consent for such Mitigation Cost, such consent not to be unreasonably withheld.

(*Id.*, ¶ 9).

The Policy, at Section IV.GG., defines "Professional Claim" as "a written demand, demand for arbitration or mediation or suit made against you seeking Damages or correction of Professional Services and alleging a negligent act, error or omission in the rendering of or failure to render Professional Services." (*Id.*, ¶ 10). The Policy states that "Damages mean any amounts you are legally obligated to pay." (*Id.*, ¶ 11). The Policy defines "Professional Services" to include, *inter alia*, "delegated design responsibility" and "engineering." (*Id.*, ¶ 12).

Section III.E.3 of the Policy, referred to as the "Voluntary Payments Provision," governs the duties of the insured and states, in part:

As a condition precedent to this insurance, in the event of any First Party Claim, Claim or reported circumstance: . . .

You shall not voluntarily make any payment, assume or admit any liability, consent to any judgment, settle any First Party Claim or Claim, or incur any Claim Expense or Mitigation Cost, for which coverage may be sought under this Policy, without our prior written consent, except for Emergency Expense. We shall not be liable for any payment, assumed or admitted liability, consent judgment, settlement, or Claim Expense to which we have not consented. You shall not release or compromise any right you may have with respect to a First

> Party Claim or Claim without our prior written consent. We shall not be liable for any Loss attributable to a release without such consent.

(*Id.*, ¶ 14).

Exclusions to coverage are set forth in Section V of the Policy. Exclusion C, as listed in the main Policy form, provides that Berkley:

> will not be liable to make payments or indemnify you for any First Party Claim, Claim, or Loss directly or indirectly for or arising out of: ...
>
> C. any design of manufacture of any goods or products which are sold or supplied by you or by anyone under license to you, including any parts, components, assemblies or equipment installed or incorporated by on behalf of you into your work.

(*Id.*, ¶ 15).

Tindall procured a Customized Design Endorsement that supersedes Exclusion C, and provides, in part, that Berkley:

> will not be liable to make payments or indemnify you for any First Party Claim, Claim or Loss directly or indirectly for or arising out of: . . .
>
> C. any design or manufacture of any goods or products which are sold or supplied by you or by anyone under license to you, including any parts, components, assemblies or equipment installed or incorporated by or on behalf of you into your work. . . .
>
> Furthermore, this **Exclusion shall not apply to Protective Claims or Professional Claims resulting from** the customized design of any glass or atrium structure, window cleaning structure, steel bridge or decking structure, curtain walls, **precast or pre-stressed concrete structures**, or other items specifically described in Table A, **though no insurance is provided herein for (1) the cost to replace, improve, upgrade, service or maintain or remove any customized product referenced herein**, or (2) Bodily Injury or Property Damage in connection with such Protective Claims or Professional Claims in the event such Bodily Injury or Property Damage is insured elsewhere, whether in whole or in part.

(*Id.*, ¶ 16) (emphasis added). The Policy defines "First Party Claim" to include, in part, any "request of us by you for Mitigation Cost or for sums arising out of any of the insuring agreements." (*Id.*, ¶ 17).

Section X.A. of the Policy, entitled "Reporting a Claim or First Party Claim" provides, in part, "As a condition precedent to coverage under this Policy, in the event of a Claim or First Party Claim, you must do the following: 1. Report the Claim or First Party Claim to us in writing as soon as reasonably possible, which must be during the Policy Period […]." (*Id.*, ¶ 20).

### *Baxter Project and Tindall's Engineering Errors*

In March 2017 and December 2018, Tindall entered into contracts with D.J. Keating Construction Company and Design Distribution America, respectively, to design, manufacture, deliver, and install precast concrete members to form a 175,000 square foot concrete superstructure for the roof of the Clearwell Basin located at the Samuel S. Baxter Water Treatment Plant in Philadelphia, Pennsylvania (the "Project" or "Baxter Project"). (Dkt. No. 31-1, ¶ 5). The City of Philadelphia Water Department ("PWD") hired Keating as the general contractor on the Project. (Dkt. No. 32-6, ¶ 22). Tindall was a sub-contractor of Keating. (Dkt. No. 31-1, ¶ 7). Under the contracts, Tindall agreed to perform the role of "Specialty Structural Engineer." (*Id.*, ¶ 6).

Tindall's role in the Project was to design and manufacture 422 concrete members known as "double-tees" ("DTs"), which formed the roof structure for the water treatment plant. (Dkt. No. 32-6, ¶ 23). The contracts required Tindall to manufacture the DTs in accordance with Project specifications and drawings, and the applicable code requirements. (Dkt. Nos. 31-1, ¶ 6; 32-6, ¶ 24). The concrete DTs were reinforced with

steel. (Dkt. No. 32-6, ¶ 24). Section 2.3.B of the contract specifications state: "Cover for reinforcing steel shall be a minimum of 1.5 inch. Metal chairs, with or without coating, shall not be used on the finished face." (*Id.*). The specifications required a minimum of 1.5 inches of concrete cover over the reinforced steel to provide a measure of durability to the structure and protect the embedded steel elements against corrosion. (*Id.*, ¶ 25).

Tindall designed and engineered the precast concrete members, ultimately delivering them to the Project location in September 2019, with installation commencing on September 9, 2019. (Dkt. No. 31-1, ¶ 8). On September 9, 2019, PWD's inspector issued to Keating a non-conformance report ("NCR") based on a "field inspection of concrete precast installation" which identified cracked DTs and reported that some DTs "do not comply with design documents and Project specifications." (Dkt. No. 32-6, ¶ 27). As to two DTs, "it was observed that contractor did not maintain the required minimum concrete cover for the reinforcement during casting." (*Id.*).

PWD's inspector issued two more NCRs concerning Tindall's precast concrete products on September 12, 2019 and September 13, 2019. (*Id.*, ¶ 29). On September 12, 2019, Tindall sent an email to Keating concerning "NCR Reports" at the Project, stating that Tindall was committed to "providing a high quality precast system that conforms to the Project requirements." (*Id.*, ¶ 30).

On September 17, 2019, PWD proposed a call with Tindall's design engineer to discuss the DTs. (*Id.*, ¶ 31). A telephone call was set for September 20, 2019. (*Id.*, ¶ 31). Later in the day on September 17, 2019, PWD emailed Keating regarding "unacceptable precast double-tees." (*Id.*, ¶ 32). The email stated:

> Our inspection team has noted several significant deficiencies, and (at your request) has agreed to provide the NCRs for your use. We have

also informed DJK [Keating] that we have observed deficiencies that concern us beyond your ability to repair onsite [...].

We are concerned that some members do not even appear to have the correct specified dimensions (flange thickness, length, etc.).

[...] PWD reserves the right to refuse payment for any precast members installed that were deemed unacceptable by our inspection team Any delays caused by DJK's supplier not providing adequate materials shall not be chargeable to the City, nor shall any work to remove/replace unacceptable pieces installed by DJK be chargeable.

(*Id.*). Keating forwarded PWD's September 17, 2019 email to Tindall, stating, "We have not received the Tindall QC records expected. We have the repair info [from] Jeff and letter. We need this asap. As you can see below, this is now a high priority." (*Id.*, ¶ 33).

On September 18, 2019, PWD's inspector issued Non-Conformance Report #5 ("NCR #5") identifying that a specific double-tee, DT-266, "[did] not comply with a Production/Q.C.Note on submittal no 03400-011-00. Production/QC notes states 'Maintain 1 ½ [inch] cover on steel in stem.' [...] Concrete cover of the exposed rebar was found less than 1 ½ [inch]." (*Id.*, ¶ 34). On the same date, Keating emailed NCR #5 to Tindall, along with another NCR issued that day, and directed Tindall to "review and respond to the attached NCR's provide the schedule corrections and correction schedule [sic]." (*Id.*, ¶ 35). On September 19, 2019, Tindall wrote to Keating in response to NCR #5, acknowledging that "[a] horizontal #4 bar x 30 [inch] long welded to the bearing plant assembly does not have the required 1 ½ inch concrete cover." (*Id.*, ¶ 37).

An internal Tindall email dated September 18, 2019 concerning the DT identified in NCR #5 stated: "PWD is taking the position that all reinforcing steel must have 1 ½ [inch] coverage. Setting this is at our risk. I'd suspect that we'd have a lot like this." (*Id.*, ¶ 36). A recipient of the email testified that he understood the email's author to be referring

9

to "numerous double tees that do not have the inch-and-a-half coverage" because of the way they were designed. (*Id.*).

On September 18, 2019, PWD sent an email to Keating stating the following:

> Please be advised that we are very concerned with the quality and integrity of the structural precast members that are currently being installed on the subject Project. A number of members have been marked with NCR's that have not been fully addressed. Field discussions were held on some of these issues and Tindall noted they were to be promptly addressed. The Department is no longer willing to accept members that are not in accordance with the Contract Documents. Immediate resolution of this matter is required to allow continued installation of precast work on this Project. Hopefully these matters can be addressed on Friday, Sept. 20s scheduled conference call. If after the meeting any items remain unresolved, those pieces that have been marked with an NCR shall be removed from the Basin. No further work on the Precast members will be allowed to proceed until all quality and other concerns can be addressed.

(*Id.*, ¶ 38). Keating forwarded this email to Tindall, explaining "It seems they are giving us until Friday to get our act together. Let's plan to talk tomorrow." (*Id.*, ¶ 39).

On September 19, 2019, PWD sent a letter to Keating with the subject line: "Structural Integrity of the Precast Members at Clear well Basin." (*Id.*, ¶ 40). The letter stated:

> Please be advised that we are very concerned with the quality and integrity of the structural precast members that are currently being installed on the subject Project. A number of members have been marked with NCR's that have not been addressed to our satisfaction. Field discussions were held on some of these issues and Tindall noted they were to be promptly addressed.
>
> The Department is not willing to accept members that are not in accordance with the Contract Documents. Immediate resolution of this matter is required to allow continued installation of precast work on this Project. The frequency and severity of the noted defects calls into question the effectiveness of the quality control being performed by DJK and their subcontractors. Hopefully these matters can be addressed in the Friday, September 20, 2019 scheduled conference call. If after the meeting any items remain unsatisfactory to PWD,

> those pieces that have been marked with an NCR shall be removed from the Basin.
>
> No claims for related delay will be entertained as the cause lies with DJK and their subcontractors and suppliers. […].

(*Id.*). Keating forward this letter to Tindall, directing that the "response to the NCR's and conference call tomorrow morning at 10 am should address matters, and hopefully establish a course going forward." (*Id.*, ¶ 41).

On September 20, 2019, Tindall emailed Keating stating that, following that morning's call with PWD, Keating, and PWD's inspector, Tindall had reviewed its existing products and design documents and recognized that Tindall was "likely infringing on the 1.5 [inch] steel coverage requirement for the Project." (*Id.*, ¶ 42). The email identified four such instances of likely infringement, including the "immediate ends of the Double T stem […] where coverage is less than 1.5 [inches]." (*Id.*). The email further stated: "[W]e also recognized that the water department has long term durability concerns with this coverage infringement. In an effort to put their mind at ease, we could propose installing a sealer or protective waterproofing slurry to the affected areas." (*Id.*, ¶ 43). According to Tindall's summary of the meeting, Tindall was "directed to 'x-ray' or provide an equivalent approach to determine the coverage on the steel in the Double Tee stems – particularly at the bearing location where we have the most steel." (*Id.*, ¶ 44).

Tindall contacted a consultant engineering firm, Wiss, Janney, Elstner Associates, Inc. ("WJE"), to diagnose, evaluate, and determine the appropriate remedy for the observed deficiencies. (*Id.*, ¶¶ 45-46). WJE did onsite testing, including x-rays, and review of the double-tee stems to provide an opinion on durability and lifespan of the DTs. (*Id.*). WJE began performing services for Tindall on September 26, 2019 and Tindall approved

payment for those services in December 2019. (*Id.*, ¶ 47). Effective September 28, 2019, Tindall established job reserves in the amount of $300,000 to cover additional anticipated expenses for the Project. (*Id.*, ¶ 48).

By October 1, 2019, nine separate NCRs had been issued concerning the DTs and identifying cracks and spalls in the concrete members. (*Id.*, ¶ 49). The parties dispute whether any NCR issued before September 30, 2019 had identified global non-compliance with the 1.5-inch steel coverage requirements. (*Id.*, ¶ 49; Dkt. No. 34-3, ¶ 49). An internal Tindall email dated October 2, 2019 reports that PWD had withheld payments on the Project and Keating would be contacting Tindall's surety. (Dkt. No. 32-6, ¶¶ 50). Tindall's internal email discussed the DT issues, including the cracks and 1.5-inch coverage issue, stating that the "concrete cover issue" was expected to "merit greater than normal repair efforts." (*Id.*, ¶ 51). At this point, erection of the structure was approximately 50% complete. (*Id.*, ¶ 50).

On October 3, 2019, PWD sent Keating a letter seeking an expert opinion about the DTs, which "do not comply with approved specifications," with respect to cracks and "double tee rebar cover." (*Id.*, ¶ 53). The email stated that PWD had "concerns for safety, structural soundness, long-term service and whether the product is spec compliant." (*Id.*). Keating forwarded this email to Tindall. (*Id.*, ¶ 54).

Email correspondence from WJE to Tindall in October 2019 confirms that WJE planned to investigate the durability and structural integrity of the double-tees and advise on remediation options, should the investigation show that the service life of the precast concrete members was "less than agreed by the parties or that [the] structural integrity is less than required by the building code." (*Id.*, ¶¶ 55-57). Through WJE, Tindall undertook

an investigation of various methods for correcting its apparent engineering error. (Dkt. No. 31-1, ¶ 13). WJE determined that Tindall could correct the error by applying an elastomeric coating to the last four feet of every DT stem, coupled with grouting the joints at the ends of the stems. (*Id.*, ¶ 14).[3]

On October 10, 2019, Tindall sent an email to Keating stating that "Tindall acknowledge[d] there are certain conditions that don't meet what was specified in the contract documents." (Dkt. No. 32-6, ¶ 58). An internal Keating email responded, "Not exactly the defense I was looking for and I am not sure this will calm any nerves at PWD. They acknowledge they haven't provided spec compliant material and are not close to providing a durability analysis." (*Id.*, ¶ 59).

Earlier on October 10, 2019, Keating had sent a letter to PWD disagreeing with the characterization of the Project specifications concerning the 1.5-inch steel coverage requirement. (*Id.*, ¶ 60). It read: "The specification does not address embedded items. The specification addressed reinforcing steel. Clearly, embeds, such as bearing plates are not referenced and are not considered reinforcing steel." (*Id.*). According to Tindall, "it is ordinarily presumed that this type of cover requirement does not apply to the bearing plate anchorage or lifter at the ends of the precast double tee members," and "[s]uch secondary reinforcing steel is not always required to be subject to the cover requirements for primary reinforcing steel." (*Id.*, ¶ 61).

On October 11, 2019 and October 14, 2019, Keating emailed Tindall in order to forward correspondence from PWD and to explain that PWD was looking for assurance

---

[3] Berkley denies that the actions would "correct" an "engineering error;" asserting instead that application of an elastomeric coating would "stop or delay the corrosion process" and "would reasonably restore the durability lost due to less-than specified concrete covers." (Dkt. No. 33-1, ¶¶ 14-15).

that the costs necessary to finish the structure would be at the contractor's expense. (*Id.*, ¶¶ 62-65). Keating stated: "We need Tindall to accept responsibility for the cost of removing and replacing any precast components that PWD does not ultimately accept." (*Id.*). The parties disagree about their respective expectations at that time as to who would bear the costs and the consequences of any failure to meet the contract terms. (*Id.*, ¶¶ 66-67; Dkt. No. 34-3, ¶ 66-67).

At a meeting with PWD held on October 15, 2019, Tindall offered to have WJE conduct a life-cycle evaluation based on the structural integrity of the DTs to demonstrate that the DTs were functionally equivalent to the DTs provided for in the specifications, however such analysis was rejected by PWD. (*Id.*, ¶ 71; Dkt. No. 34-3, ¶ 71). PWD stated it wanted "performance equivalent to 1.5 inch (1-1/8 inch) of cover, meaning whatever the concrete provides plus the additional benefits of a coating." (Dkt. No. 32-6, ¶ 72). At that meeting, Tindall agreed to "engage a QC inspector to oversee the repairs being made to the precast." (*Id.*, ¶ 73). PWD insisted that Tindall hire an entity named Pennoni Associates, Inc. (*Id.*).

On October 25, 2019, WJE issued an investigative report and findings, along with a proposal for coating the double tee stems. (*Id.*, ¶ 76). Tindall submitted to Keating the WJE report and Tindall's proposal to coat the end 4 feet of each double tee stem with "C.I.M. [Chevron Industrial Member] 1061 High Performance Coating," an elastomeric urethane coating. (*Id.*, ¶¶ 77, 80). WJE's report detailed the concrete coverage measurements performed and the related findings, including that the embedded steel and mesh cover measurements ranged from ¼ inch to 3.5 and 3.25 inches, respectively, and that between 70% and 81% of the measured DTs were within applicable code tolerances.

(*Id.*, ¶ 79). WJE reported that "systemic cover deficiencies were noted at stem faces within 4 feet of the ends of the DTs." (Dkt. No. 31-1, ¶ 11; Dkt. No. 33-1, ¶ 11). The report concluded that "an application of C.I.M. at its standard wet film thickness (0.060 inches) in areas of deficient cover at the DT stem ends would reasonably restore the durability lost due to less-than-specified concrete covers." (Dkt. No. 32-6, ¶ 80).

Tindall contends that the coverage issues on the stem ends extended to every precast double tee furnished by Tindall on the project, however Berkley argues that WJE's analysis does not support that statement. (Dkt. No. 31-1, ¶ 11; Dkt. No. 33-1, ¶ 11). Further, the parties dispute whether WJE determined that the failure to provide 1.5 inches of concrete cover was the result of an engineering error by Tindall. (*Id.*).[4]

Tindall's expert engineer, Mr. Lepard, testified that he was not sure if the 1.5-inch cover specification was required by building code, rather than by project specifications only. (Dkt. Nos. 32-6, ¶ 68; 34-3, ¶ 68). Keating's vice-president of operations also testified that there was some debate over whether ACI [American Concrete Institute] standards required 1.5 inches of cover. (*Id.*).

In late October 2019, Tindall increased the job reserves set aside for the Project by $1 million, bringing the total reserve amounts to $1.3 million. (Dkt. No. 32-6, ¶ 85). This amount was subsequently increased to $2 million in the end of November 2019 and increased again to $2.2 million in January 2020. (*Id.*, ¶¶ 96, 102).

By early November 2019, all DTs were at the Project site and the parties expected to complete installation by November 11, 2019. (*Id.*, ¶ 86). On November 6, 2019, Tindall

---

[4] The materiality of these facts is limited, as Berkley does not argue that it denied coverage because the non-conforming products were caused by something other than the professional errors of Tindall. Nor has Berkley argued that remediation of all, rather than some, of the DTs was unnecessary.

received a bid from a subcontractor named Zack Painting Company to apply coating to the ends of the DTs to remediate the errors with the precast concrete. (*Id.*, ¶ 87).

On November 20, 2019, WJE provided a service-life analysis to Tindall concluding that "the actual cover profile versus design profile results in 7-12 year difference in life expectancy. We have data that indicated that CIM 1061 will give us at least 7-12 years extra life." (*Id.*, ¶ 88). Email correspondence from Tindall to Keating dated November 25, 2019 reflects that Tindall was "ready to provide corrective measures" for the Project and was frustrated that PWD had not yet approved the proposal. (*Id.*, ¶¶ 91-92).

By December 5, 2019, all DTs had been installed at the Project and the parties continued to work toward PWD's final approval of Tindall's proposal. (*Id.*, ¶ 97). On December 20, 2019, PWD approved Tindall's proposal to apply coating to all 422 DTs at the Project. (*Id.*, ¶ 98). PWD also approved several subcontractors for work on the DTs. (*Id.*, ¶ 106). A March 18, 2020 email from Keating to Tindall and others summarized that "all repairs to be performed are acceptable and would restore the DTs to their functional equivalent [sic] for performance and life cycle." (Id., ¶ 105).

### *Claim Reporting and Denial*

On April 13, 2020, Tindall reported through its broker a "Notice of Circumstance that may reasonably give rise to a Claim" under the Policy to Berkley. (Dkt. No. 32-6, ¶ 110). The broker identified "a potential engineering problem" at the Project and identified PWD as the claimant. (*Id.*). The broker's email to Berkley enclosed a summary of expenses incurred in the investigation and a portion of Tindall's anticipated remediation costs. (*Id.*, ¶ 112).

Berkley's claims handler, Derek Steffen, and Berkley's retained professional engineer, Alfred Schaer, reviewed Tindall's insurance claim. (Dkt. No. 31-1, ¶ 18). Mr. Steffen initially determined that no professional claim had been asserted against Tindall prior to October 1, 2019. (*Id.*, ¶ 33). Berkley characterizes Mr. Steffen's determination as being that no professional claim had been asserted against Tindall at any time. (Dkt. No. 33-1, ¶ 33).

On June 16, 2020, Berkley issued a letter denying coverage for Tindall's claim and issued a supplemental coverage position letter on July 17, 2020. (Dkt. No. 32-6, ¶ 117). Berkley explained that "the need to improve, upgrade, and service the double tees to conform with the Project specifications is excluded from coverage" pursuant to the Customized Design Endorsement. (*Id.*). Berkley's coverage letters reserved all rights under the policy and law to deny coverage on other grounds, including to the extent that Tindall violated Policy Section III.E.3 through pre-reporting payments and admission of liability. (*Id.*, ¶ 118-19). Neither of the denial letters asserted that there had been a professional claim against Tindall before October 1, 2019. (Dkt. No. 31-1, ¶ 36). Berkley thereafter informed Tindall that it reserved the right to "deny any obligation under the Policy based on Tindall's failure to satisfy the Insuring Agreement requirement that a claim must be first made against an insured and reported to Berkley during the same policy period." (Dkt. No. 32-6, ¶ 120).

During the claim review period, from April 13, 2020 to June 16, 2020, Berkley did not request that Tindall delay or stop its plans for correcting the engineering error, nor did Berkley express any objection or suggest any alternatives to Tindall's stated plans. (Dkt. No. 31-1, ¶¶ 20-21). The parties do not agree as to whether Tindall obligated itself to

PWD to perform the remediation work prior to the claim denial. Tindall asserts there was no binding, written agreement with PWD or Keating requiring that any remediation had to be carried out. (*Id.*, ¶ 24). Berkley asserts that Tindall's contract with Keating required Tindall to address non-conformances and that it was agreed upon by PWD and Tindall that the elastomeric coating and grout remediation method would be employed. (Dkt. No. 33-1, ¶ 24).

Tindall's claim for damages in this lawsuit initially sought to recoup expenses for WJE consulting work, however Tindall no longer seeks those costs. (Dkt. No. 32-6, ¶ 113). Tindall seeks damages for costs to correct the non-conforming double-tees which totals $1,606,411, consisting of $1,183,700 paid to Zack Painting Company; $334,815 paid to Pullman SST, Inc.; and $87,896 paid to Pennoni Associates. (Dkt. No. 31-1, ¶ 15).

The parties dispute whether Tindall hired and made payments to vendors and subcontractors from Tindall's job reserves during the period of November 2019 through March 2020. (Dkt. No. 32-6, ¶ 103). Tindall claims that it only seeks reimbursement from Berkley for remediation work that was performed on the Project after the date that Berkley first received notice of Tindall's claims, i.e. April 13, 2020. (Dkt. No. 31-1, ¶ 25; Dkt. No. 33-1, ¶ 25). However, inspection work performed by Pennoni, for which Tindall does seek reimbursement, commenced in December 2019, prior to the date of the claim. (*Id.*, ¶ 26). Further, on December 20, 2019, Tindall hired Pullman SST, Inc. for grouting work on the Project. (Dkt. No. 32-6, ¶ 100). The parties dispute whether this contract was for general work or specifically for remediation work on the DTs, and when such remediation work on the DTs began. (*Id.*; Dkt. No. 34-3, ¶ 100). They also disagree on the total amount paid by Tindall to Pennoni and Pullman for work performed prior to June 16, 2020, the date of

the claim denial. (Dkt. No. 31-1, ¶ 26; Dkt. No. 33-1, ¶ 26). Lastly, the parties dispute the date upon which Tindall entered into a contract with Zack Painting. (Dkt. No. 32-6, ¶ 101; Dkt. No. 34-3, ¶ 101). Berkley offers that a contract was formed on January 21, 2020, while Tindall argues that the document relied on by Berkley was unsigned and did not constitute a contract at that time. (*Id.*). Nonetheless, it is undisputed that the work performed by Zack Painting Company did not begin until October 26, 2020. (*Id.*).

## DISCUSSION

### *Rule 56 Standard*

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is to be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56. A genuine issue of material fact exists "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). "[V]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier [of fact] could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Bay v. Times Mirror Magazine, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991). When a movant has met this burden, the burden shifts to the non-movant to bring forth evidence establishing the existence of an issue of material fact. *Linares v. McLaughlin*, 423 Fed. Appx. 84, 86 (2d Cir. 2011).

In evaluating a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party, and it is the burden of the moving party to demonstrate the absence of any material genuinely in dispute. *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir. 1988). Importantly, a court must not

"weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (citation omitted). However, a party cannot defeat a motion for summary judgment by relying upon conclusory statements or mere allegations unsupported by facts. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The nonmoving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). Where, as here, both parties move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't*, 249 F.3d 115, 121 (2d Cir. 2001).

### Application

Berkley provided several reasons for denying coverage under the Policy for Tindall's professional liability claim. The first rationale offered by Berkley is that the Customized Design Endorsement of the Policy excludes coverage for costs incurred to "improve" or "upgrade" any customized concrete structures designed by Tindall. Second, Berkley denied coverage on the ground that Tindall did not timely report the claim to Berkley. Third, Berkley denied coverage on the basis that Tindall did not have Berkley's consent to admit or assume liability or incur costs to remedy its engineering defects, in violation of the Policy's "Voluntary Payments Provision." Tindall disputes each of these grounds for claim denial. Both parties assert that there are no contested issues of fact and that they are entitled to judgment as a matter of law.

For the reasons that follow, the Court finds that the undisputed evidence supports Berkley's third denial rationale, i.e. that Tindall admitted or assumed liability in violation of the Policy's Voluntary Payments Provision. In an abundance of caution, the Court has addressed each of Berkley's reasons for denying coverage.

Insurance contracts are governed by the general rules of contract interpretation. *Jin Ming Chen v. Insurance Co. of the State of Pa.*, 36 N.Y.3d 133, 138 (2020). In resolving disputes concerning the scope of coverage, courts look to the specific language in the relevant insurance policies. *See id.* When a dispute hinges on contract interpretation, "summary judgment may be granted when [the contract's] words convey a definite and precise meaning absent any ambiguity." *Nautilus Ins. Co. v. Jirsa Constr. Co.*, 244 F. Supp. 3d 315, 319 (W.D.N.Y. 2017) (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). Summary judgment is only proper in contract disputes if the language of the contract is "wholly unambiguous." *Mellon Bank, N.A. v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir. 1994). The question of whether a contract is clear or ambiguous is to be decided by the court as a matter of law. *Id.*

An ambiguity exists where the terms of the contract "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010). Contract language is not ambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and

concerning which there is no reasonable basis for a difference of opinion." *Hunt, Ltd., Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (citation omitted).

The insured party must demonstrate the existence of coverage and the satisfaction of all conditions precedent, including the timeliness of notice. *Thomson v. Power Auth. of State of N.Y.*, 217 A.D.2d 495, 496 (1st Dept. 1995). Whereas "a defendant asserting an affirmative defense bears the burden of proof with respect to that defense." *Cellco Partnership v. City of Rochester*, 719 F. Supp. 3d 256, 265 (W.D.N.Y. 2024). Under New York law, once the insured shows that a covered loss has occurred, the insurer shoulders the burden of demonstrating that the loss claimed is excluded expressly from coverage under the policy terms. *McCormick & Co. v. Empire Ins. Group*, 878 F.2d 27, 30 (2d Cir. 1989). Exclusionary clauses are given the interpretation most beneficial to the insured. *Id.*

### 1. *Policy Exclusions*

The Professional Liability Policy issued by Berkley to Tindall provides that Berkley will defend Tindall against any professional claim that arises out of an actual or alleged negligent act, error or omission in the rendering of or failure to render professional services by Tindall. It further provides that Berkley will pay damages and claim expenses on Tindall's behalf for such professional claims. Exclusion "C" of the Policy excludes coverage for claims arising out of the design or manufacture of products. However, as a designer and manufacturer of precast and pre-stressed concrete products, Tindall procured a Customized Design Endorsement which supersedes and adds a limited exception to Exclusion C. The Customized Design Endorsement of the Policy provides that the Exclusion C does not apply to protective claims or professional claims resulting

from customized design of precast or pre-stressed concrete structures. The Endorsement adds the caveat that no insurance coverage is provided for "the cost to replace, improve, upgrade, service or maintain or remove any customized product" referenced therein.

The parties agree that Tindall's claim for its work at the Baxter Water Treatment Plant falls within the exception to the exclusion for precast or pre-stressed structures. However, Berkley denied coverage for the claim on the grounds that the Policy excludes coverage for costs incurred to "improve" or "upgrade" such products. It is Berkley's theory that Tindall's application of elastomeric coating and joint grouting constituted an improvement or upgrade to the concrete double-tees for which the Policy provides no coverage. Tindall argues that the remediation efforts were not improvements, but corrective measures taken to bring the double-tees up to specification following Tindall's engineering error. Tindall offers that Berkley's interpretation of the contractual term "improve" is too broad, particularly when reading the insurance policy as a whole.

"To negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case." *Westview Assoc. v. Guarantee Nat'l Ins. Co.*, 740 N.E.2d 220, 223 (N.Y. 2000). The New York Court of Appeals has enforced policy exclusions "only where we found them to 'have a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion.'" *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 12 N.Y.3d 302, 307 (2009). Thus, under New York law, Tindall does not need to show that its proffered reading of the word "improve" is the only possible reading, it only needs to show that its reading is reasonable.

Berkley offers that the plain and ordinary meaning of the word "improve" is to "enhance in value or quality; make better."[5] It argues that Tindall's application of the coating bolstered each beam's durability and increased their lifespan, thus "improving" the product.

On the other hand, Tindall argues that the terms "improve" and "upgrade" are reasonably understood to mean measures that enhance the value of, or add benefit to, an already satisfactory product, rather than the repair or correction of a deficiency. Tindall argues that the narrower reading of "improve" which it offers is accurate because that interpretation is consistent with the five surrounding words in the exclusionary clause. It submits that the terms "replace, improve, upgrade, service, [...] maintain or remove" all refer to "peripheral activities that are not typically covered by insurance." (Dkt. No. 36, pg. 8).[6]

Indeed, under the principle of statutory construction known as *noscitur a sociis*, which translates to "it is known from its associates," New York courts interpret the meaning of contract language by considering it in context of the other terms with which it is associated. *See NFL v. Vigilant Ins. Co.*, 36 A.D.3d 207, 2014 (1st Dept. 2006). Here, it reasonable to understand each of the terms "replace, improve, upgrade, service, maintain, or remove" as conveying the idea of betterment or change to a product that is, or previously was, satisfactory. In fact, in another section of the Policy, the terms "improvement" and "betterment" are used in the same clause. *See* Policy Section IV.NN.

---

[5] *Improve*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/improve (last visited Feb. 5, 2025).
[6] Tindall additionally argues that Berkley's overly broad reading of "improve" in Exclusion C would render Exclusion D, a separate exclusion that bars coverage for the "cost to repair or replace faulty workmanship," unnecessary.

"Restoration Costs" ("Restoration Costs do not include costs associated with improvements or betterments."). Berkley acknowledges that the Restoration Costs section of the Policy means that Berkley will pay to return damaged property to its original condition, or to replace it, but will not pay for a repair that makes it better than its original condition. (Dkt. No. 43, pg. 7). This lends support to Tindall's interpretation of the word "improve" as that which enhances value, rather than that which rectifies or corrects a problem, deficiency, or state of deterioration.

Further, a Professional Claim is defined under the Policy as a demand seeking damages or "correction of Professional Services." Berkley's interpretation of the term "improve" would necessarily exclude coverage for any correction of services, which is the heart of its liability coverage. This supports Tindall's position that the Policy's use of the terms "improve" and "upgrade" does not definitively exclude coverage for correction of engineering errors. *See Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122 (2011) ("Insurance contracts must be interpreted according to common speech and consistent with the reasonable expectations of the average insured."); *Westview Assoc.*, 740 N.E.2d at 222 ("Exclusions must be specific and cannot be extended by mere interpretation or implication."). Berkley's interpretation would render the policy worthless.

Accordingly, the Court finds that Tindall has put forth a plausible interpretation of the clause that would afford it coverage under Policy. It is reasonable to interpret "improve" or "upgrade" to mean measures that enhance the value of a satisfactory product, rather than efforts to repair or correct a design error or deficiency. The Court cannot say that the losses incurred by Tindall to apply coating to the stems of the defective double-tees were clearly and unmistakably excluded from coverage under this Policy.

Further, the Court rejects Berkley's claim that the undisputed evidence shows that Tindall's remediation actions created double-tee beams that were improved beyond their contract specifications. Although it is undisputed that inadequate concrete cover diminished the lifespan of the beams by 7 to 12 years, Berkley contends that WJE determined that the elastomeric coating would add 20 to 30 years to the beams' lifespan. Thus, Berkley argues that the coating improved the durability of the beams to the point of enhancing their quality in a manner constituting an upgrade or improvement even under Tindall's narrow reading of the terms. However, the evidence Berkley cites to support the longer lifespan prediction (a letter WJE to Tindall dated November 21, 2019) states only that the proposed C.I.M. coating "should easily last for more than 20 years or even 30 years" after installation. (Dkt. No. 32-5, pg. 36). That statement offers no opinion about the lifespan of the double-tees overall, nor does it convey that the beams have been upgraded or improved beyond the contract specifications.

Berkley additionally argues that coverage does not exist for these losses because the Policy covers only third-party or consequential damages caused by Tindall's engineering errors. Berkley points to Section I.B. of the Insuring Agreement which provides that the insurer will pay on the insured's "behalf all Damages and Claim Expense" for a professional claim. It submits that the Policy would have covered any damages Tindall was required to pay due to its own professional liability but does not cover expenses related to fixing Tindall's own products. Berkley argues that this conclusion is consistent with the intent of a "products exclusion" clause, which "exists to exclude coverage for business risks, including claims that the insured's product or completed work was not that for which the damaged person bargained." *See Basil Dev.*

*Corp. v. Gen. Acc. Ins. Co.*, 89 N.Y.2d 1057, 1058 (1997) (citations omitted). The intent of products exclusion clauses in liability policies is "to exclude coverage for damage to the insured's product, but not for damage caused by the insured's product to persons or property other than the insured's own product." *Lowville Producer's Dairy Co-op, Inc. v. Am. Motorists Ins. Co.*, 198 A.D.2d 851, 852 (4th Dept. 1993); *see also Tradin Organics USA, Inc. v. Md. Cas. Co.*, 325 Fed. Appx. 10, 11 (2d Cir. 2009). Berkley argues that it issued a liability insurance policy, "not a surety for a construction contractor's defective work product." *See Bonded Concrete, Inc. v. Transcon. Ins. Co.*, 12 A.D.3d 761, 762 (3d Dept. 2004).

However, contrary to Berkley's contentions, the wording in Exclusion C and the Customized Design Endorsement, which amends Exclusion C, does not contain such restrictions on coverage for Tindall's own products. In *Lowville*, the relevant policy exclusion stated that "this insurance does not apply [] to property damage to the named insured's products arising out of such products or any part of such products." *See* 198 A.D.2d at 851. By contrast, the Policy procured by Tindall expressly provides coverage for "protective claims and professional claims resulting from the design of […] precast or pre-stressed concrete structures." Further, there is no limitation of coverage to "consequential damages," a term which appears nowhere in the Policy.

The Court also rejects Berkley's argument that the policy does not provide mitigation coverage for Tindall's own products. Berkley asserts that the Customized Design Endorsement specifically excluded costs incurred by the insured in attempting to mitigate losses stemming from its design errors or other professional claims against it. The Court disagrees that the Endorsement's silence on the issue of mitigation means that

mitigation coverage does not apply. On the contrary, the Policy generally provides mitigation cost coverage and requires Tindall to take actions to mitigate damages for itself and for Berkley. *See* Policy Section I.F. ("We agree to pay you or on your behalf for Mitigation Cost in excess of any applicable Self-Insured Retention to mitigate or avoid a Professional Claim […].") The Customized Design Endorsement contains no language to contradict this.

Thus, the Court concludes Tindall has shown that a covered loss occurred, and that Berkley has failed to meet its burden to prove that such loss was excluded from coverage.

2. *Timing of Claims Made*

Next, Berkley denied coverage on the ground that the claim was not first made during the policy period in which Tindall reported the claim to Berkley. Insuring Agreement B of the Policy provides coverage only where a "Professional Claim is made against [the insured] during the Policy Period […] and reported in writing by [the insured] to [Berkley] during" that period. The policy at issue here is a "claims-made-and-reported" policy, which means that coverage generally extends only to those claims made by or against the insured and reported to the insurer within the policy period. *Berkley Assur. Co. v. Hunt Constr. Group*, 465 F. Supp. 3d 370, 377 (S.D.N.Y. 2020). Such a policy "protects the insured for claims made against it and reported to the insurer within the policy period or, if applicable, the extended reporting period." *Id.* (quoting *CheckRite Ltd. v. Ill. Nat'l Ins. Co.*, 95 F. Supp. 2d 180, 191 (S.D.N.Y. 2000)). The timing of the notice is the trigger for coverage in a claims-made policy and is thus material to the existence or nonexistence of the coverage. *Calocerinos & Spina Consulting Eng'rs, P.C. v. Prudential Reinsurance*

28

*Co.*, 856 F. Supp. 775, 780 (W.D.N.Y. 1994). The authorities establish that there is no coverage under a claims-made policy where the insured fails to notify the insurer of a claim by the end of the policy period (or extended reporting period, if any). *CheckRite*, 95 F. Supp. 2d at 192.

Here, the Policy requires that notice of a claim must be given to Berkley during the same policy period in which a Professional Claim was made against Tindall. Here, the relevant Policy period ran from October 1, 2019 to October 1, 2020.[7] It is undisputed that Tindall reported the claim to Berkley on April 13, 2020, during the Policy period commencing on October 1, 2019. However, the parties dispute the date upon which a Professional Claim was first made against Tindall relating to the Project.

The Policy defines a Professional Claim as "a written demand, demand for arbitration or mediation or suit made against [the insured] seeking Damages or correction of Professional Services and alleging a negligent act, error or omission in the rendering of or failure to render Professional Services." "A 'claim' need not be a formal lawsuit, but 'an accusation that wrongdoing occurred is not by itself a claim . . . ; nor is a naked threat of a future lawsuit . . . ; or a request for information or an explanation . . . . A claim requires, in short, a specific demand for relief.'" *Schlather, Sumbar, Parks & Salk, LLP v. One Beacon Ins. Co.*, 10-CV-0167, 2011 U.S. Dist. LEXIS 147931, at *13 (N.D.N.Y. Dec. 22, 2011).

Berkley asserts that a claim was made against Tindall on or before September 19, 2019. To support this, Berkley cites documents and correspondence from the

---

[7] It is noted that Tindall purchased from Berkley five consecutive professional liability policies covering the period of October 1, 2016 to October 1, 2021, at a total cost of $840,578. (Dkt. No. 31-15, ¶ 25). The Policy at issue in this dispute is the fourth of those five policies. (*Id.*). However, Tindall does not dispute that the claim was reported during the October 1, 2019 to October 1, 2020 policy period.

Philadelphia Water Department to Keating, the Project's general contractor. These PWD documents, specifically a Non-Conformance Report #5 dated September 18, 2019 and correspondence dated September 18 and 19, 2019, were forwarded by Keating to Tindall on September 19, 2019. NCR #5 identified that the concrete cover on a single specified double-tee was found to have less than 1.5-inch cover and concrete spall damage resulting in exposed steel. NCR #5 included a note by Alex Ramirez, of Tindall, that corrective action would be taken by removing the member the following day. PWD's correspondence then identified problems with numerous precast concrete double-tees, including the failure to maintain 1.5-inches of concrete cover over reinforcing steel components. The September 18, 2019 email and September 19, 2019 letter to Keating expressed PWD's concern about the structural integrity of the precast members in general and stated that no further work on the precast members would be allowed to proceed until those concerns could be addressed. Berkley argues that these documents were demands for corrective action which Keating transmitted to Tindall for immediate resolution and correction of services. Because the alleged demands were "first made" to Tindall before the Policy Period in which Tindall reported the claim to the insurer, Berkley believes that the Policy does not cover the claim.

On the other hand, Tindall contends that the above-referenced documents and communications do not constitute a "Professional Claim" under the Policy terms. Tindall argues that no written demand was made against Tindall until after October 1, 2019, when Keating sent emails demanding that Tindall bear the costs of work associated with correcting the non-conforming double-tees.

As Tindall points out first, the Policy requires that a demand be made against the insured to qualify as a Professional Claim. The September 2019 documents relied on by Berkley to establish the date of the first claim were not directed to Tindall. The correction requests were expressly made by PWD to Keating and neither of those letters, nor the Non-Conformance Report, were addressed to Tindall. Tindall argues that the earliest a demand was made to Tindall directly was on October 14, 2019, during the subject Policy period. In fact, Tindall will present evidence that Berkley's own claims adjuster concluded that these documents did not constitute a claim because they were directed to Keating, not Tindall.

Tindall further argues that although NCR #5 and PWD's letters communicated dissatisfaction with the double-tees, neither met the legal definition of a "demand." Tindall submits that the documents do not invoke any legal rights or threaten any legal action against Tindall or Keating. Although "demand" is not defined under the Policy, under New York law, "a demand requires an imperative solicitation for that which is legally owed," as distinguished from a request carrying no legal consequences. *Weaver v. Axis Surplus Ins. Co.*, 639 Fed. Appx. 764, 766 (2d Cir. 2016) (summary order). Tindall also argues that these communications did not allege any "negligent act, error or omission in the rendering or failure to render Professional Services." Supporting Tindall's position is the fact that although PWD's September 2019 correspondence clearly expresses that PWD was not satisfied with non-conforming products, those communications do not state that a professional services error has occurred, nor do they expressly demand any action. Instead, they refer to verbal discussions and proposed meetings, suggesting that an informal resolution of the issues may have been anticipated at that time.

Tindall again relies on evidence that Berkley's claims adjuster and his supervisor made their own determination that the September 2019 communications from PWD to Keating were not written demands under the Policy. Instead, the adjusters testified that when they reviewed the claim they categorized this as a "Notice of Circumstances," that was not yet a Professional Claim. In turn, Berkley relies on evidence that its own designation of the claim was changed from "Notice of Circumstances" to a "Professional Claim" after a fuller picture of the claim was developed.

Courts have held that a mere contention that some wrongdoing occurred, without a demand for specific relief owed because of the alleged wrongdoing, does not constitute a claim. *See In re Ancillary Receivership of Reliance Ins. Co.*, 55 A.D.3d 43, 49 (1st Dept. 2008) ("The mere awareness of alleged wrongdoing is not a 'claim' within the meaning of the typical claims-made policy."); *In re Ambassador Group Litig.*, 830 F. Supp. 147, 155-56 (E.D.N.Y. 1993) (holding that a letter lacking a specific demand for relief or any enumeration of wrongful acts was merely a general assertion that wrongdoing occurred, not a claim under the insurance policy); *Evanston Ins. Co. v. GAB Business Services, Inc.*, 132 A.D.2d 180, 185 (1st Dept. 1987) (finding that no claim existed where a letter contained statements of dissatisfaction with company's performance and a demand for future performance in accordance with the contract, but contained no mention of damages or compensation); *but see McCabe v. St. Paul Fire & Marine Ins. Co.*, 79 A.D.3d 1612, 1614 (4th Dept. 2010) (determining that a letter which did not request monetary damages, but did allege that the insured party was negligent and must rectify the problem, was a claim under a professional liability insurance policy).

Here, the parties dispute the nature of the communications that occurred prior to the start of the Policy term. Questions of fact exist as to whether the September 2019 documents cited by Berkley constituted "Professional Claims" made against Tindall under the terms of the Policy. Thus, neither party is entitled to judgment as a matter of law on this issue.

3. _Voluntary Payments Provision_

Berkley also denied coverage for the claim on the basis that Tindall did not have its consent to admit or assume liability, or incur costs, for the engineering defects. The Policy provides that, as a condition precedent to coverage, the insured "shall not voluntarily make any payment, assume or admit any liability, consent to any judgment, settle any first party claim or claim, or incur any claim expense or mitigation cost, for which coverage may be sought under this policy, without [Berkley's] prior written consent, except for emergency expense. [...]." Under the Policy, Berkley "shall not be liable for any payment, assumed or admitted liability, consent judgment, settlement, or Claim Expense to which [it] has not consented."

Berkley argues that Tindall committed to installing the DTs, paid for a proposal to improve the DTs after installation, committed to abide by the proposal, and contracted with subcontractors to perform the work all prior to notifying Berkley or obtaining Berkley's consent. From these actions, Berkley asserts that Tindall failed to preserve for Berkley the opportunity to defend or compromise the claim. Thus, Berkley submits, Tindall is not entitled to recover under the policy. _See Diversified Mortg. Invs. v. U.S. Life Title Ins. Co. of N.Y._, 544 F.2d 571, 575 (2d Cir. 1976) ("an insured who does not comply with the terms of his policy by preserving for his insurer the opportunity to defend or compromise, is

usually not entitled to recover under his contract"); *Royal Zenith Corp. v. N.Y. Marine Mgrs.*, 192 A.D.2d 390 (1st Dept. 1993) (finding insurers not liable because the insured voluntarily assumed liability by stipulation of settlement without the defendant insurers' written consent).

Here, the record before the Court compels a finding that Tindall admitted or assumed liability for its professional errors without Berkley's consent and in violation of the Policy terms. The undisputed evidence shows that as early as September 2019 Tindall acknowledged to PWD that it had supplied non-compliant double-tee beams. From September 2019 through December 2019 Tindall repeatedly made admissions of liability and proposed remedies for its non-compliance with the project specifications. It was not until April 13, 2020 that Tindall notified Berkley of a possible claim under the Policy. At that time, Tindall's liability for the alleged professional errors and its plan for remediating the non-compliant products was presented to Berkley as a *fait accompli*.

The record contains multiple writings in which Tindall admitted contractual breach and liability to both PWD and Keating without the consent of its insurer. For example, on September 20, 2019, Tindall sent an email stating that it was "likely infringing on the 1.5 [inch] steel coverage requirement for the project" and it "proposed installing a sealer or protective waterproofing slurry to the affected areas." On October 10, 2019, Tindall stated to Keating that it acknowledged that "certain conditions," including the minimum concrete coverage, did not meet the contract specifications. On November 25, 2019, Tindall again acknowledged "nonconforming portions of its work" and told Keating that it was "ready to provide corrective measures."[8]

---

[8] Tindall also provided more general assurances to PWD and Keating that it would fulfill its obligations. These included a September 12, 2019 email in which Tindall stated it was committed to "providing a high

Although the parties disagree about the exact expectations of Tindall and Keating regarding costs associated with remediation work, it is undisputed that Keating felt that "any consequences of not meeting the requirements of the contract would be Tindall's to bear." (Dkt. No. 34-3, ¶¶ 66-67). It is further undisputed that Tindall "repeatedly assured" Keating that it could address the issues and would "absolutely uphold" the project specification and contract documents. (*Id*.). Tindall also agreed to continue installing the defective beams at the Project, knowing that future remediation work would need to be performed at a significant expense and limiting the potential remediation options.

The evidence also reflects that Tindall retained WJE as a consultant engineering firm and offered WJE's proposals for remediation to PWD and Keating, all prior to reporting the insurance claim. Indeed, on December 20, 2019, PWD approved Tindall's written proposal to apply elastomeric coating and grout to the end section of each double-tee stem. Based on this approved plan, Tindall engaged subcontractors regarding the coating and grouting work. Tindall also set aside substantial job reserves, up to $2.2 million as of January 2020, reflecting its own expectation that it was liable for these costs. Each of these actions occurred months before Tindall notified Berkley of a potential claim.

Tindall does not dispute that it acknowledged problems with the precast concrete members prior to reporting the claim to Berkley in April 2020. In fact, Tindall states it was an "indisputable fact" that certain DTs had concrete cover of less than 1.5 inches. However, Tindall maintains that it did not make a formal admission of liability about

---

quality precast system that conforms to the Project requirements," and an October 10, 2019 letter to Keating in which Tindall stated it was "committed to working with the design team to determine an appropriate course of action for providing a structure that meets the City's needs." These generalized statements of reassurance do not contradict or discharge the specific admissions of liability made by Tindall in its other written communications.

engineering errors nor was it contractually obligated to make any payments for proposed remediation work until the work was performed.

The Court finds the matter of *Travelers Indem. Co. v. Northrup Grumman Corp.*, to be instructive. *See* 4 F. Supp. 3d 599 (S.D.N.Y. 2014), *aff'd* 677 Fed. Appx. 701 (2d Cir. 2017). There, the insured company in a pollution liability insurance case was blamed for groundwater contamination. *Id.*, at 602. The insured advised the project owner that it would bear the "capital and annual operation and maintenance costs for well head treatment," would provide funding for treatment of the public supply well, and that it agreed to provide treatment for all contaminated wells. *Id.*, at 611-12. The Court found that these "commitments to pay for treatment" without notice to or consent of the insurer violated the voluntary payment provisions of the insurance policy and negated the insured's coverage. *Id.*

Here, Tindall's conduct was analogous. Tindall failed to obtain Berkley's consent before admitting to having provided non-conforming products, committing to continue installing the non-conforming products, providing a proposal for remediating the installed products, and hiring subcontractors to perform the work. The Policy does not require Berkley's consent only for formal agreements or settlements, as argued by Tindall. The Policy provides that Berkley is not liable "for any payment, assumed or admitted liability, consent judgment, settlement, or Claim Expense" to which Berkley has not consented. Under its terms, any voluntary assumption or admission of liability by the insured without consent of the insurer is a bar to coverage. *See Travelers Indem.*, 4 F. Supp. 3d at 612 (finding that the insured party violated the plain language of the policy which states that the insured shall not "assume <u>any</u> obligation") (emphasis in original). No reasonable jury

could find that Tindall's numerous written communications acknowledging errors and the steps it took to formulate and propose remediation plans did not constitute admissions of liability.

Tindall further argues that any admission or assumption of liability is of no consequence because the proposed remediation work was not performed prior to April 13, 2020, when it reported the claim to Berkley.[9] Tindall submits that it has incurred $1,606,384 in total remediation costs, of which only $109,999 in costs were incurred prior to June 16, 2020, the date Berkley denied the claim. (Dkt. No. 36, pg. 10 n.2). Tindall argues that when an insurer is offered an opportunity to defend or settle a claim on behalf of its insured, and instead chooses to deny coverage, the insured is excused from the voluntary payments clause. *See J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 53 Misc. 3d 694, 695 (Sup. Ct. N.Y. Cnty. 2016), *aff'd* 151 A.D.3d 632 (1st Dept. 2017) ("New York law is clear that where [...] an insurer denies liability, the insured is free to enter into a reasonable settlement without obtaining the insurer's consent."); *see also Isadore Rosen & Sons, Inc. v. Security Mut. Ins. Co.*, 31 N.Y.2d 342, 347 (1972) ("where an insurer 'unjustifiably refuses to defend a suit, the insured may make a reasonable settlement or compromise of the injured party's claim, and is then entitled to reimbursement from the insurer, even though the policy purports to avoid liability for settlements made without the insurer's consent'"); *American Ref-Fuel Co. of Hempstead v. Resource Recycling, Inc.*, 281 A.D.2d 573 (2d Dept. 2001) ("[o]nce an insurer repudiates liability ... the [in]sured is excused from any of its obligations under the policy."). According to the facts presented by Tindall, Berkley denied coverage before 93% of Tindall's remedial costs were incurred.

---

[9] The only costs that Tindall undisputedly incurred prior to April 13, 2020 were those paid to WJE consultants. Tindall no longer seeks to recoup those costs under the Policy.

Therefore, Tindall contends that it had no obligation to obtain Berkley's consent for those expenses because the claim had already denied.

Tindall's argument is misguided. Regardless of the costs Tindall had or had not paid for remediation work as of the claim denial date, Tindall had already admitted liability for those costs and thus failed to give Berkley a full opportunity to investigate, defend, or compromise the claims. The undisputed evidence shows that by the time Tindall reported its professional liability claim to Berkley, Tindall had already breached the condition precedent to coverage by its own admissions and stated commitments to PWD and Keating to address its contractual breaches. Tellingly, Tindall provides no authority to support its claim that an insurer's consent condition is not breached if costs or payments by the insured were not made until after the claim was denied. To the contrary, New York courts have enforced similar consent clauses in instances where the insured made payments, committed to pay for remedial work, or consented to judgment without the insurer's consent. *See Travelers Indem.*, 4 F. Supp. 3d at 612; *Royal Zenith*, 192 A.D.2d at 390. Here, the policy provision was clear in that Tindall was barred from voluntarily making any payments or assuming or admitting liability without the prior consent of Berkley.

Lastly, Tindall asserts that Berkley is equitably estopped from denying coverage under the Voluntary Payments Provision because Berkley had an opportunity to review the remediation plan but elected not to do so, instead choosing to deny coverage. Tindall asserts that Berkley had a two-month period between April 14, 2020 and June 16, 2020 when it was investigating the claim and could have voiced objections to Tindall's plans.

Under New York law, equitable estoppel requires a showing of: (1) an act constituting a concealment of facts or false misrepresentation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoers; and (4) reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment. *General Electric Capital Corp. v. Armadora*, 37 F.3d 41, 45 (2d Cir. 1994). Where an insurance carrier knowingly conceals or misstates facts with the intention or the expectation that such conduct will be relied upon, and the insured substantially changes its position to its detriment in reasonable reliance upon the false impression thus created, the carrier is estopped from taking a position inconsistent with that which was misstated or concealed. *One Beacon Ins. Co. v. Old Williamsburg Candle Corp.*, 386 F. Supp. 2d 394, 401 (S.D.N.Y. 2005). Equitable estoppel is an "extraordinary remedy" that is to be "invoked sparingly and only under exceptional circumstances." *Roeder v. J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601, 616 (S.D.N.Y. 2021).

There is no evidence in this case that Berkley knowingly concealed or misstated facts with the intent that they would be relied upon; that Tindall substantially changed its position in reliance on those facts or false impressions; nor that Berkley has since taken a position inconsistent with a misstated or concealed fact. The record contains no indications that Berkley made any misrepresentations during or after the claim investigation period concerning the remediation work which Tindall intended to perform. Berkley's mere silence on the remediation plan does not amount to a misrepresentation or falsehood. Thus, Tindall's assertion of equitable estoppel is without merit.[10]

---

[10] The Court notes that Tindall's equitable estoppel claim may also be rejected on the grounds that it is not pled in the complaint. "A party asserting equitable estoppel is required to allege facts in support of

In sum, the Court finds that Berkley has proven that it properly denied coverage on the grounds of Tindall's admission or assumption of liability without consent. Thus, Berkley is entitled to judgment as a matter of law on Tindall's breach of contract claim. Accordingly, the Court recommends that summary judgment be granted in Berkley's favor.

## CONCLUSION

For the foregoing reasons, it is recommended that defendant Berkley Assurance Company's motion for summary judgment (Dkt. No. 32) be GRANTED. It is further recommended that plaintiff Tindall Corporation's motion for summary judgment (Dkt. No. 31) be DENIED.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Sinatra, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Sinatra. ***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

---

estoppel." *Pfohl Bros. Landfill Site Steering Comm. v. Allied Waste Sys.*, 255 F. Supp. 2d 134, 171 (W.D.N.Y. 2003). Tindall's complaint does not allege estoppel or any facts to support such a claim.

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988).*

Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R. Civ. P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED.**

DATED:      February 20, 2025
                 Buffalo, New York

MICHAEL J. ROEMER
United States Magistrate Judge